COMMONWEALTH *vs.* JOHN J. LANNING.

No. 90-P-292.

Bristol. March 21, 1991. - March 24, 1992.

Present: PERRETTA, DREBEN, & IRELAND, JJ.

*Rape. Indecent Assault and Battery. Evidence,* Prior misconduct, Fresh complaint, Expert opinion.

At the trial of indictments for forcible rape of a child and for assault and battery on a child under the age of fourteen years, the judge did not abuse his discretion in concluding that the probative value of evidence of other incidents of misconduct by the defendant outweighed the risk of prejudice, where the evidence tended to corroborate the victims' testimony and to show a common scheme and pattern of behavior. [282-283]

A judge properly exercised his discretion to deny a criminal defendant's motion for a mistrial, prompted by prejudicial testimony of a witness, and, instead, to give a curative instruction to the jury. [283-284]

At a criminal trial, the judge's instructions to the jury with respect to evidence of other misconduct by the defendant presented no risk of a miscarriage of justice. [284]

At a rape trial a witness's testimony concerning the defendant's conduct toward the victim was admissible under the fresh complaint doctrine. [284-285]

At a rape trial, a note given by one of the victims to an investigator for the district attorney's office was properly admitted in evidence as a fresh complaint. [285-286]

At a rape trial, the victim's statements, admitted under the fresh complaint doctrine, were shown to be reasonably prompt in the circumstances. [286]

At a rape trial there was no reversible error in admitting certain testimony by a social worker and investigator under the fresh complaint doctrine, even though it was more detailed than the victims' own testimony, where the Commonwealth did not use the detailed testimony as substantive evidence, and where the details related to matters that had already been revealed to the jury. [286-287]

In the circumstances, a judge was not required to conduct a voir dire of each of four fresh complaint witnesses at a rape trial. [287]

At a rape trial no substantial risk of a miscarriage of justice was occasioned by the judge's omitting an instruction on fresh complaint testimony from his final charge to the jury, where he had accurately in-

structed them on the limited use of such testimony before it was
received. [287-288]

At a rape trial, a doctor's expert testimony concerning the possibility of
vaginal penetration, although it was not elicited through a hypothetical
question, presented no occasion for reversal of the convictions. [288-
289]

INDICTMENTS found and returned in the Superior Court
Department on June 16, 1987.

The cases were tried before *Cortland A. Mathers*, J.

*Robert J. Catalano* for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the
Commonwealth.

PERRETTA, J. At his jury trial on indictments charging him
with two counts of indecent assault and battery on a child
under the age of fourteen years and two counts of rape of a
child by use of force, there was evidence of uncharged bad
acts by the defendant and of fresh complaint by the two vic-
tims, sisters. The defendant claims on appeal, as to the bad
acts, that this evidence was inadmissible, overwhelmingly
prejudicial, and insufficiently instructed upon by the trial
judge. In respect to the fresh complaint testimony, he argues
that the complaints were not prompt and that the trial judge
failed to include a limiting instruction in his final charge to
the jury. The principles of law controlling on all these issues
are established. Applying these principles to the facts of this
case, we affirm the convictions.

1. *The evidence.* We assign fictitious names to the victims.
The time period set out in the indictments is January 1,
1985, to on or about April 23, 1987. The indictments were
returned on June 16, 1987, and trial commenced on
March 1, 1989. On that date, the victims, Jane and Linda,
were fifteen and thirteen years of age, respectively.

Jane related that she had known the defendant since she
was a little girl. Her mother was friendly with the defend-
ant's mother. During this time, she would see the defendant
about once a week. When she was about nine years old, she
and her family (mother, brother, and Linda) moved in with
her grandmother and uncle. After the move, they lived

nearer to the defendant, who resided with his parents. Jane and Linda's mother worked at night, and the defendant's mother was elderly and ill, spending much of her time, according to Jane, in either her bedroom or the kitchen. Jane became accustomed to spending much time with the defendant's mother and was frequently at the Lanning house.

It was in December, 1985, when the sexual abuse of Jane began. Jane was babysitting for the defendant's son, who was visiting from Ohio. She was asleep in the Lanning guestroom when the defendant arrived home sometime between 1:00 and 2:00 A.M. She testified that she awoke when he got into her bed. He was naked, and she hit him. He hit her back and held her down on the bed. He then had vaginal and anal intercourse with her. She did not cry out, because she was afraid that his parents would hear her. The defendant left the room, and Jane went back to sleep. She went home that morning, telling no one what the defendant had done to her.

The second incident occurred on the date Jane experienced her first menstruation. She called her mother from school and asked to be brought home. Her mother did not have a car, and she sent the defendant in her stead. Jane related that the defendant brought her to his house and told her how he would have intercourse with his wife while she was menstruating. Jane asked the defendant to take her home, but he would not. He penetrated her vagina with his fingers and tongue. During the final act of abuse to which Jane testified, forcing her to perform oral sex on him and to fondle his genitals, the defendant threatened her: if she told anyone about what he had done, he would commit these same acts upon Linda. She also related that on one occasion the defendant punched her in the eye.

In addition to this testimony supporting the acts charged in the indictments, Jane described how she and her friends had watched pornographic movies with the defendant at his house. She also related an incident involving the defendant's use of her hair clip on her girlfriend's breasts.

The acts committed upon Linda were no less horrible and began when she was about nine years old. At first, the abuse

took the form of fondling her breasts and buttocks, but it intensified. The defendant's attempts to have vaginal and anal intercourse with Linda were very painful for her. The defendant would warn her to keep silent as he attempted to penetrate her. Linda testified that she did not think that the defendant ever deeply entered her because of her pain. He frequently (fifteen to twenty times) performed acts of digital penetration on her. When she would tell the defendant to stop, he would strike her. She too watched pornographic movies while at the defendant's house.

There were threats of harm if Linda ever told anyone about these acts. On one occasion, the defendant held a BB gun to Linda's head and stated that if she told anyone, he would kill her. Another time, he took a doll that he had given her and stabbed and decapitated it with a steak knife. Should she tell anyone, he would do the same to her. Linda testified that the last incident of sexual abuse by the defendant was about two weeks before Easter, 1987.

Discovery of the defendant's conduct came about on April 14, 1987. As Linda's aunt was driving Linda to a previously scheduled appointment with a doctor, Linda told her about what the defendant had been doing to her.

2. *Evidence of other misconduct.* In addition to the testimony of Jane and Linda concerning the pornographic films and Jane's hair clip, three of their friends related that they had been in the defendant's house with one or the other sister and had seen pornographic movies or books. On some occasions, the defendant was present. One of the girls related that while she was watching such a film with Jane, another friend, and the defendant, the defendant fast-forwarded the film to the more explicit scenes and asked whether they would like to perform the depicted activity when they were older. The defendant lodged objections to all this testimony. He did not object at trial but now complains about the testimony of another friend. This witness testified that she and Jane were watching a pornographic movie at the defendant's

house. He arrived home to find them and became angry, telling them that they should not have played the film.[1]

Another friend testified that the defendant had shown pornographic books to her and Jane at his house and, on three or four occasions, had grabbed her buttocks and fondled and kissed her. He told her that he wished she were older so that he could do things to her that he had done with her mother.

Susan Lynch, an investigative social worker with the Department of Social Services (DSS), testified, as fresh complaint evidence, that when she interviewed Jane, Jane told her how the defendant had placed her hair clip on her friend's breast. There was no specific objection by the defendant to this evidence, other than his earlier request for a "continuing objection to the summary nature" of the testimony.

"Evidence of independent . . . [misconduct] unconnected with the crimes for which the defendant is on trial may not be used to show commission of the crime[s] charged. *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695 (1979). There are, however, many exceptions to this rule of evidence." *Commonwealth* v. *King*, 387 Mass. 464, 469 (1982). See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986), wherein cases pertaining to the various exceptions to the rule are collected. In the present case, the evidence corroborated the victims' testimony and showed a common scheme and pattern of behavior. On the entire record, we conclude that the trial judge did not abuse his discretion in finding that the probative value of the evidence outweighed the risk of undue prejudice. See *Commonwealth* v. *King*, 387 Mass. at 471-472; *Commonwealth* v. *Fleury-Ehrhart*, 20 Mass. App. Ct. 429, 430-431 (1985). See also *Commonwealth* v. *Helfant*, 398 Mass. at 225.

When Linda was asked on redirect examination why she continued to return to the Lanning home throughout this period of abuse, she replied: "Because I was trying to help the mother, his mother from getting beaten." The prosecutor

---

[1] As this testimony could be viewed as favorable to the defendant, we attribute the lack of an objection to a tactical decision.

then asked: "By whom?" The defendant's complaint here is that the trial judge erred in denying his motion for mistrial. We need not consider whether that evidence was admissible (see *Commonwealth* v. *Montanino*, 409 Mass. 500, 505-506 [1991]; *Commonwealth* v. *Hollyer*, 8 Mass. App. Ct. 428, 429-431 [1979]; *Commonwealth* v. *Washington*, 28 Mass. App. Ct. 271, 273 [1990]), because the trial judge sustained the defendant's objection and instructed the jury to "disregard the child's answer to keep [the mother] from being beaten." We see no abuse of discretion in the decision to deny a mistrial and, instead, to give a prompt instruction "to correct any error and to remedy any prejudice to the defendant." *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989), and cases therein cited.[2]

Nor do we see a risk of a miscarriage of justice in the trial judge's final instructions to the jury on this issue: "[T]here is no indecent assault and battery count here for anyone but [Jane and Linda]. There is no other child involved in whatever evidence you may have in mind of indecent assault and battery. The only charge against this defendant that has to do with indecent assault and battery is on one or the other . . . [Jane or Linda]." Not only did the defendant not object to this instruction, he expressly stated that he was "satisfied" with it.

3. *Evidence of fresh complaint.* There were four witnesses who testified to fresh complaint by the victims: the victims' young cousin, the victims' aunt, the DSS social worker, and an investigator from the district attorney's office. Before any of the fresh complaint evidence was presented to the jury, there was a bench conference. At this time, the trial judge had heard the testimony of Jane and Linda concerning the relationship between their family and the defendant and his family, as well as the threats of the defendant. The expected

---

[2]The defendant makes the same argument — entitlement to a mistrial — in respect to the prosecutor's question, on cross-examination of the defendant's father, whether it was true that the defendant's son no longer wished to visit with his father. The trial judge admonished the prosecutor and excluded the question. The request for a mistrial was not pursued.

testimony was discussed in general terms, and the trial judge expressed the view that the requirement for prompt complaint was more lenient when children were involved. At the conclusion of the conference, the trial judge instructed the jury on fresh complaint evidence, the need for their consideration of the issue of promptness, and the limited purpose of such evidence. Against this backdrop, the Commonwealth presented the testimony of the four witnesses.

The victims' cousin testified that Jane told her that the defendant made her take her clothes off and do things she did not like or want to do. Jane was crying when she told her cousin about the defendant. The defendant objected to this testimony on the stated basis that it referred to events outside the period to which the bill of particulars spoke. We see no error.

When the witness was asked when this conversation with Jane took place, she responded: "I don't know. Probably about three years ago." The trial judge allowed the evidence to show a common pattern of behavior.

Assuming but specifically not deciding that the trial judge erred in admitting the evidence on the basis that he did, but see *Commonwealth* v. *Machado*, 339 Mass. 713, 715 (1959), we conclude that the evidence was admissible as a fresh complaint. Even if the cousin's answer was less than positive and precise, it appears that Jane's complaint was made within the time span covered by the indictments and concerned the defendant's conduct towards her during that time period. That Jane's statement to her cousin might have pertained to acts outside the information provided by the particulars did not require its exclusion, especially in view of the ongoing nature of the defendant's acts. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 157, cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *Amirault*, 404 Mass. at 223, quoting from *Commonwealth* v. *Hayes*, 311 Mass. 21, 25 (1942).

The fact that fresh complaint was made in the course of interviews by the social worker and investigator does not preclude the Commonwealth's use of those statements. See *Commonwealth* v. *Amirault*, 404 Mass. at 229-230; *Com-*

monwealth v. *Brenner*, 18 Mass. App. Ct. 930, 932 (1984). Nor do we think it was error for the investigator to read to the jury a note given to her by Jane. The investigator testified that during the interview Jane was "[v]ery reluctant to talk about what happened to her," "[s]he'd stare at the floor all the time," "[s]he was answering with one word, yes or no," and "[s]he'd cry." Rather than tell the investigator what the defendant had said to her, Jane wrote it down and gave the note to the investigator. We know of no rule requiring the exclusion of a victim's written fresh complaint, see *Commonwealth* v. *Izzo*, 359 Mass. 39, 43 (1971), and we can think of no reason why the admissibility of such evidence should turn on whether the complaint was written or oral.

It is also the defendant's claim that the testimony of the social worker and investigator should have been excluded from evidence because the complaints to them were not reasonably prompt and because the complaints were related in summary, yet graphic, form. In respect to the issue of delay, we have considered (as did the trial judge) the ages of the victims, the relationship between the families of the victims and the defendant, the time period involved, and the defendant's threats to the victims. We conclude that the admissibility of this testimony is supported by the precedents collected in Appendix B to *Commonwealth* v. *Dion*, 30 Mass. App. Ct. 406, 416-417 (1991). The defendant makes the same argument, lack of promptness, in respect to the fresh complaint testimony of the victims' aunt. As Linda testified that the last act of abuse by the defendant occurred about two weeks before Easter, 1987, and as she complained to her aunt in April, 1987, to the social worker nine days later, and to the investigator the day after that, her complaints cannot be viewed as stale. *Ibid.*

There can be no question that the fresh complaint statements related by the social worker and the investigator were more graphic and explicit than the victims' testimony. Additionally, portions of their testimony could be read as including some details to which the victims did not testify. However, "[u]nlike other jurisdictions, the rule in Massachusetts

allows not only evidence of complaint but a recital of all the details of the alleged wrong as contained therein." Liacos, Massachusetts Evidence 171 (5th ed. 1981), citing *Commonwealth* v. *Bailey*, 370 Mass. 388, 391-397 (1976). See also *Commonwealth* v. *Kirouac*, 405 Mass. 557, 564-565 (1989). But see *Commonwealth* v. *Lavalley*, 410 Mass. 641, 645-646 (1991). In the present case, the Commonwealth did not use these details as substantive evidence to fill in any gaps in the proof of material issues. See *Commonwealth* v. *Bailey*, 370 Mass. at 396; *Commonwealth* v. *Lagacy*, 23 Mass. App. Ct. 622, 628-629 (1987). Contrast *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 518-519, 527 n.8 (1991). Rather, these details showed a pattern of behavior by the defendant, a course of conduct already revealed to the jury by much of the victims' testimony as well as the evidence of his prior misconduct. Consequently, were we to conclude that there was error in admitting this fresh complaint testimony, we would also conclude that it was harmless. See *Commonwealth* v. *Izzo*, 359 Mass. at 43.

It is also the defendant's contention, as we understand it, that the trial judge was required to conduct a voir dire of each fresh complaint witness and make individual preliminary determinations as to the promptness of the complaints. Although it is "proper practice for the trial judge to face the question of law squarely and make a distinct ruling," *Commonwealth* v. *Dion*, 30 Mass. App. Ct. at 413, failure to follow that practice does not constitute reversible error. See *Commonwealth* v. *Sherry*, 386 Mass. 682, 691 (1982). Moreover, we do not think that the trial judge deviated from the "proper practice" in any significant way, if at all. As earlier noted, he conducted a bench conference on the topic of the Commonwealth's anticipated evidence, and he then instructed the jury properly on fresh complaint testimony.

There was, however, no instruction on this evidence in the trial judge's final charge to the jury. Although the defendant requested no such instruction, took no objection, and stated that he was "satisfied" with the charge, his appellate counsel complains about this omission. In concluding that we see no

substantial risk of a miscarriage of justice in the trial judge's failure to include an instruction on fresh complaint evidence in his final charge, we are guided by our recent decision in *Commonwealth* v. *Almon*, 30 Mass. App. Ct. 721, 724-726 (1991). Although the Commonwealth presented fresh complaint evidence, that testimony was not the major part of its case. Further, and as previously noted, the testimony was not relied upon by the Commonwealth to fill in any gaps in its substantive evidence. Moreover, the jury were not uninformed as to the limited use to which the evidence could be put, as they had been instructed at length on the topic before any of that testimony was put to them. Compare *Almon, supra.*

4. *The medical evidence.* Called to testify by the defendant, the doctor who examined Linda stated that his physical examination of her revealed that her hymenal ring was intact. On cross-examination by the prosecutor, the doctor was asked, "[B]ased upon the history that you elicited from or with respect in this case, were you able to form an opinion as to whether or not intercourse had occurred?" The doctor responded that he had "concluded that full vaginal penetration had not occurred," that is, that "penetration had not occurred sufficiently to disrupt her hymen." He was next asked whether his opinion would be consistent with the "insertion of the tip of the penis into her genitalia?" He answered, "Yes," and, in response to further questions, described the female anatomy.

It is the defendant's argument that the doctor's opinion was inadmissible because it was based upon "history" which included the aunt's account of Linda's statements to her. For the following reasons, we conclude that if there was error, it was harmless. The import of the defendant's direct examination of the doctor was to establish that Linda had not been raped, as shown by the fact that her hymenal ring was intact. The prosecutor elicited the doctor's opinion to correct the false notion that an intact hymenal ring excludes, or is inconsistent with, penetration. See *Commonwealth* v. *McCan*, 277 Mass. 199, 203 (1931); *Commonwealth* v. *Gallant*, 373

Mass. 577, 584 (1977). Compare *Commonwealth* v. *Mendrala*, 20 Mass. App. Ct. 398, 402-404 & n.9 (1985).

The defendant argues that the doctor's opinion reasonably could have been understood to mean that "some penetration may have occurred." As construed, the argument continues, the opinion was based solely on the aunt's statements and was, therefore, inadmissible. We think the argument ignores Linda's testimony that the defendant did not penetrate her deeply. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 527 (1986), quoting from *Commonwealth* v. *Russ*, 232 Mass. 58, 73 (1919), and citing additional cases and authorities for the established rule that an expert may base an opinion upon facts in evidence. When the doctor's testimony is considered in its entirety and in light of Linda's testimony, the error, if any, in allowing him to state his opinion that full vaginal penetration had not occurred is that it was not elicited through a hypothetical question. We would not view any such error as requiring reversal of the defendant's conviction on the indictment charging him with this rape. See *Commonwealth* v. *Howard*, 355 Mass. 526, 530-531 (1969).

*Judgments affirmed.*